UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GOSSAMER WING, LLC, AS TRUSTEE,

        Plaintiff,

v.

                          CASE NO.  8:21-CV-00624-WFJ-AEP

THE BANK OF NEW YORK MELLON fka
THE BANK OF NEW YORK, as Trustee for
the Certificateholders of CWABS, Inc., Asset-
Backed Certificates, Series 2007-2,

                          (formerly Palm Beach County
                          Case No. 2020-CA-011308)

        Defendant.
_____/

## DEFENDANT'S MOTION FOR SANCTIONS AND ATTORNEY'S FEES

Defendant, by and through its undersigned counsel, hereby moves, pursuant to Fed. R. Civ. P. 54, Local Rule 7.01, 28 U.S.C. § 1927 and the Court's inherent power to impose sanctions against Plaintiff's attorney Lee Segal a/k/a Lior Segal ("Segal"), and Segal & Schuh Law Group, P.L., and states:

## I.   INTRODUCTION

This Motion details an egregious scam, committed by a Florida attorney, Lee Segal, to obtain a portfolio of high-value default judgments against large banking institutions, by failing to serve them with process, and by engaging in many other improper tactics. This case is one of approximately *eighty* identical lawsuits filed in late-2020 against Deutsche Bank National Trust Company ("**DBNTC**") and The Bank of New York Mellon ("**BNYM**"). *See* Ex. 2. As discussed below, Segal's scam actually began in late-2019 and early-2020, when Segal filed over a dozen "Test Cases" against

1

many large financial institutions engaged in foreclosures to identify the victims of this scam. *Infra*, § III.A; Ex. 1. Ultimately, Segal improperly obtained default judgments in these cases totaling more than *thirty million dollars*—in just a few months, without engaging in any substantive litigation, on frivolous claims. *See infra*, Ex. 2.

This Motion is supported by publicly-available court filings, as detailed in Defendant's accompanying Request for Judicial Notice and Notice of Intent to Use Summary, which attaches two charts: (1) the chart of Segal's Test Cases; and (2) the chart of cases filed in late-2020 against DBNTC and BNYM throughout Florida. These two charts are cited as **Exhibits 1 and 2**, respectively. The Court should consider the entirety of Segal's conduct in determining the appropriateness of sanctions. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 40, 57 (1991); *Danubis Grp., LLC v. Landmark Am. Ins. Co.*, 685 Fed. Appx. 792, 803 (11th Cir. 2017); *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 278 F.3d 175, 189 (3d Cir. 2002).

This Motion seeks reimbursement of Defendant's attorney's fees and costs incurred in defending this lawsuit—by Segal personally. The sanctionable conduct in these cases, including making material misrepresentations to courts, was committed by Segal personally, and not the plaintiffs. Therefore, attorney's fees and costs should be imposed against Segal personally, as well as his law firm, Segal & Schuh Law Group, P.L. *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980). As requested below, Segal should also be required to disclose the remaining undiscovered cases filed against DBNTC and BNYM, which he has failed and refused to do. *Infra*, § IV.

As the case law illustrates, the fraud that Segal has been perpetrating through the court system far surpasses the threshold for imposing sanctions. In fact, each of Segal's improper tactics has been found to be an independently sufficient basis to impose sanctions. Taken cumulatively, the breadth of his scheme and its many improper features undoubtedly warrant sanctions. And it is only appropriate to view Segal's conduct in its entirety, especially given that each improper action was only one aspect of his overall scheme. For example, it was not enough for Segal to not serve defendants with process, or to not mail court filings to defendants despite claiming in certificates of service that he had, or to misrepresent to the courts that defendants had been personally served and failed to respond, while failing to disclose that defendants had received no notice of these cases, or to file these cases in random counties across the entire state based on false allegations. Instead, he needed to do *all* of those things, and more, to "successfully" perpetrate his scam. And his remaining misconduct—such as filing frivolous complaints, and voluntarily dismissing cases in which the defendant discovered the lawsuit before default could be entered and then secretly re-filing the case in a new distant venue without any notice—is clearly sanctionable, *i.e.*, it was done in bad faith, vexatiously, or for oppressive reasons.

Viewed in its entirety, Segal's conduct reveals the true nature of his scam—to obtain and record massive default judgments against foreclosure plaintiffs, at any cost. Defendant is seeking reimbursement for the unnecessary and avoidable attorney's fees and costs that it has had to incur to address this misconduct, defend against this scam, and to uncover and vacate millions of dollars in void judgments.

3

## II.   LEGAL STANDARD

### A.   The Courts' Inherent Power to Impose Sanctions

Courts have the inherent power to police litigants and counsel appearing before them. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43. This power "must be exercised with restraint and discretion," and used "to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44-45. A court may exercise this power "to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46.

"The key to unlocking that inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). "Once unlocked, the power carries with it the authority to assess attorney's fees as a sanction for bad faith conduct." *Sciarretta v. Lincoln Nat. Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015). "As a starting point, the inherent-powers standard is a subjective bad-faith standard." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). Additionally, it is well-established that federal courts' inherent power to impose sanctions can be invoked even if procedural rules exist which sanction the same conduct. *Thomas v. Tenneco Packaging Co., Inc.*, 293 F.3d 1306, 1320 (11th Cir. 2002). When invoking its inherent power to impose sanctions, "[the Court] must make specific findings as to the individual's conduct that warranted sanctions. The court's inquiry should focus

4

primarily on the individual's conduct and motive, rather than the validity of the case."

*Wachovia Bank v. Tien*, 406 Fed. Appx. 378, 383 (11th Circ. 2010).

**B.    28 U.S.C. § 1927**

Separately, 28 U.S.C. § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

## III.   SEGAL'S CONDUCT WARRANTS SANCTIONS.

**A.    Segal filed a series of "Test Cases" to identify the victims of his scam.**

From December 2019 to July 2020, Segal filed at least seventeen lawsuits, based on prior foreclosure cases, against nine different financial institutions: (1) DBNTC; (2) BNYM; (3) HSBC Bank USA, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Bank of America, N.A.; (6) Citibank, N.A.; (7) U.S. Bank, N.A.; (8) Stearns Bank, N.A.; and (9) Synovus Bank. *See* Ex. 1. The chart of Test Cases shows two important facts: (1) Segal was able to obtain default judgments against DBNTC and BNYM based on "service" upon CT Corporation Systems (CT Corp); and (2) the other seven defendants appeared before default judgments were entered. *Id.*

For example, on July 30, 2020, Segal filed three separate lawsuits in the same county on the same day on behalf of the same plaintiff (Jimmy Aviram) against three *separate* defendants: BNYM; Stearns Banks; and Synovus Bank. Ex. 1, Rows 15-17. In the cases against Stearns Bank and Synovus Bank, the defendant appeared before

default could be entered, and in response, Segal voluntarily dismissed both cases on the same day. Ex. 1, Rows 15-16. Two days later, Segal obtained a default judgment against BNYM. Ex. 1, Row 17. Thus, Segal only intended to litigate those cases in which a default judgment could be obtained. *See* Ex. 1. In fact, the vast majority of the Test Cases against the other defendants were voluntarily dismissed by Segal, or dismissed by the court at the outset. *See* Ex. 1, Rows 3, 4, 6, 8, 15, 16. Obviously none of these cases resulted in a judgment on the merits, or even survived the pleading stage.

Since mid-2020, Segal (1) has filed around *eighty* identical cases against DBNTC and BNYM,[1] and (2) has not filed a single case against any of the seven other defendants. Ex. 2. Thus, through these cases, Segal identified *which* defendants might not respond to lawsuits, and then ramped up production against those particular ones.[2]

---

[1] As Exhibit 2 details, approximately the first seventy cases were filed by Segal, and the rest were filed in the names of other attorneys—which avoided Segal's name appearing on any docket alerts, which is how most of these cases have been discovered—based on identical filings, usually for the same clients, while Segal stayed involved in many of those cases. *See* Ex. 2, Row 40 (filed by Carla Turner-Hahn and summons required service on Segal; Segal took over case immediately after filing); Row 65 (filed by Megan Lazenby and summons required service on Segal); Row 38 (filed by Turner-Hahn and summons required service on Segal); Rows 43, 70 (Lazenby re-filed identical complaint previously filed by Segal); M.D. Fla. Case No. 2:21-cv-00080-SPC-NPM, Doc. 24 (Segal never formally appeared, but signed the response letter to CT Corp, according to his client, Mark Stopa's affidavit).

[2] It also appears that Segal has created post-hoc justifications for serving CT Corp. As this Court is aware, in cases against DBNTC, Segal justifies serving CT Corp because, after the office building at 60 Wall Street in New York City closed in *March 2020* due to the pandemic, security desk personnel at the building started giving instructions to serve "Deutsche Bank" through CT Corp. *See* Doc. 5. But in his Test Cases, this justification did not even exist yet, because Segal was serving CT Corp directly *prior to the pandemic*, without any explanation, and then obtaining default judgments based on that defective service, and despite receiving the rejection of service from CT Corp. *See* M.D. Fla. Case No. 8:21-cv-00626-SPF, Doc. 22-3. Likewise, in cases against BNYM, Segal has justified his service on CT Corp largely on the ground that BNYM maintained the same EIN as The Bank of New York, which did appoint CT Corp as its registered agent. *See, e.g.*, Doc. 21. But his detailed briefing on the service issues in these cases, throughout 2021 *and 2020*—appears to reflect that Segal first discovered the EIN argument around January 2021—*i.e.*, after he had already served CT Corp in these cases.

6

**B.    Segal knowingly failed to serve DBNTC and BNYM with process and represented the opposite to the courts.**

Once Segal discovered an avenue for obtaining default judgments—by suing DBNTC and BNYM and "serving" them with process via delivery of all summonses and complaints solely to CT Corp—he quickly began filing several lawsuits each week against them in random counties throughout Florida. Ex. 2. His identical filings in these cases, and the timing of them, make clear that they are designed solely to obtain default judgments. For example, he immediately sought clerk's defaults at the earliest opportunity, and he generally filed his motions for summary judgment after default *before* the clerk's defaults were even entered, with accompanying "affidavits" that were already executed. Ex. 2. Then he promptly submitted proposed judgments containing false findings, including that "Defendant failed to respond to the Complaint after personal service, resulting in a clerk's default," and that "Despite notice of this hearing, Defendant did not attend, nor did it counter the evidence submitted by Plaintiff."

This Court and others have already made clear in numerous decisions that service was fatally defective in these cases, against BNYM[3] and DBNTC.[4] In fact, this

---

[3] *See* Case No. 5:21cv54-TKW-MJF, Doc. 25 (N.D. Fla. Mar. 29, 2021); Case No. 8:21-cv-469-WFJ-TGW, Doc. 37 (M.D. Fla. Apr. 13, 2021); Case No. 3:21cv251-MCR-EMT, Doc. 44 (N.D. Fla. Apr. 9, 2021); Case No. 8:21-cv-726-SDM-AAS, Doc. 36 (M.D. Fla. Apr. 19, 2021).

[4] *See* Case No. 2:21-cv-00042-SPC-NPM, Doc. 31 (M.D. Fla. Mar. 1, 2021); Case No. 2:21-cv-00009-SPC-NPM, Doc. 30 (M.D. Fla. Mar. 1, 2021), Case No. 2:21-cv-00040-SPC-NPM, Doc. 26 (M.D. Fla. Mar. 1, 2021); Case No. 2:21-cv-00039-SPC-NPM, Doc. 24 (M.D. Fla. Mar. 1, 2021); Case No. 2:21-cv-00038-SPC-NPM, Doc. 29 (M.D. Fla. Mar. 1, 2021); Case No. 2:21-cv-00037-SPC-NPM, Doc. 30 (M.D. Fla. Mar. 1, 2021); Case No. 8:21-cv-00039-WFJ-TGW, Docs. 13, 15 (M.D. Fla. Jan. 22, 2021); Case No. 8:21-cv-338-T-23CPT, Doc. 21 (M.D. Fla. Mar. 12, 2021); Case No. 8:21-cv-349, Doc. 26 (M.D. Fla. Mar. 30, 2021); Case No. 8:21-cv-00630-WFJ-JSS, Doc. 31 (M.D. Fla. Mar. 31, 2021); Case No. 4:21-cv-53-AW-MAF, Doc. 27 (N.D. Fla. Mar. 12, 2021); Case No. 5:21cv14-TKW-

Court has expressly "**WARNED**" Segal that he is at risk of sanctions for "asserting the same repeatedly unsuccessful and repeatedly unwarranted argument" in cases "featuring an identical (and improper) attempt to serve the defendant," in cases against both DBNTC and BNYM. Case No. 8-21-cv-00338, Doc. 21 (M.D. Fla. Mar. 12, 2021); Case No. 8:21-cv-726-SDM-AAS, Doc. 36 (M.D. Fla. Apr. 19, 2021).

Thus, the Court is already familiar with the service issues, including the fact that CT Corp exists for the limited purpose of receiving and forwarding service of process to its customers, *which do not include DBNTC or BNYM*. Segal was acutely aware of this fact, including from his Test Cases in early-2020. Ex. 1. Indeed, as this Court's decisions explain, it is well-documented that, in each of these cases, Segal promptly received a letter from CT Corp addressed to him personally that explained that CT Corp is *not* the registered agent for defendant, and that CT Corp was *unable* to forward service to the defendant. *See also* Doc. 33. In response to being personally notified of these critical facts, Segal *never* disclosed any of this information to the courts, and he *never* attempted any other service method whatsoever. Ex. 2. The reason, of course, is that doing either of those things would have defeated his entire scam. But such tactics are clearly improper, as this Court and others have recognized: "*[Segal] owe[d] a heightened duty of candor to the clerk and court before seeking a default for 'failure to respond after personal service.' No doubt the state judge would have wanted to know that this 'personal*

---

MJF, Doc. 16 (N.D. Fla. Feb. 18, 2021); Case No. 8:20-cv-3090-VMC-AEP, Doc. 32 (M.D. Fla. Feb. 22, 2021); Case No. 8:21-cv-00276-AAS, Doc. 30 (M.D. Fla. Apr. 21, 2021).

service' was denied and disclaimed by the alleged agent served and no one had informed the actual

defendant. Had Mr. Segal filed his letter from CT Corporation with the clerk, no clerk's default

would have been issued. None of this was explained to the judge or the clerk." Case No. 8:21-

cv-469-WFJ-TGW, Doc. 37, at 4-7 (N.D. Fla. Apr. 13, 2021) (emphasis added) ("At

no time did [Segal] inform anyone (not the judge, the clerk, nor opposing counsel in

the underlying, related foreclosure) that he was seeking full relief while the registered

agent for a predecessor company denied service and declined to forward the papers to

Defendant"; "This sharp practice is rendered more acute when the claimed registered

agent expressly and promptly denies the agency and refuses to forward the papers").

And other courts have joined this Court in recognizing Segal's improper

motives and tactics behind his service scheme: "*Indeed, it appears that the location of the

filing and the manner of service in this case **were intended to ensure that [BNYM] would not

get notice of this case**, and in that regard, the actions of Plaintiff's counsel in this case have the

same **'stink of fraud-upon-the-court' (or at least unprofessional gamesmanship)** as his actions

in Kenny v. Deutsche Bank Nat. Trust Co.*, 2021 WL 778877, at *4 (M.D. Fla. Mar. 1,

2021)." Case No. 5:21-cv-00054, Doc. 25 (N.D. Fla. Mar. 29, 2021) (emphases added).

Of course, courts do not condone attorneys making material misrepresentations

and omissions to courts to gain a tactical advantage, especially in *ex parte* proceedings.

Rather, these unprofessional practices, which this Court has already observed, are

patently sanctionable, on their own. *See Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir.

2011); *U.S. Bank Nat. Ass'n, N.D. v. Sullivan-Moore*, 406 F.3d 465 (7th Cir. 2005); *Barnes*

*v. Dalton*, 158 F.3d 1212, 1213–14 (11th Cir. 1998); *see also* R. Regulating Fla. Bar:

Rule 4-3.3(a)(1); R. Regulating Fla. Bar: Rule 4-3.3(c); R. Regulating Fla. Bar 4-8.4(c).

> **C.    Segal intentionally filed these cases throughout the entire state to gain an improper tactical advantage, based on complaints containing false allegations that the cause of action accrued in each county.**

The vast majority of these cases—approximately 70 of the 80 cases, including

this case—were filed in counties that have *no* connection to the cause of action that

form the basis for these complaints. Ex. 2, Rows 13-46, 48-77, 79. To be clear, these

complaints are based on litigating a foreclosure action and recording an assignment of

mortgage *in a different county—i.e.*, the county in which the property is located. Yet, in

each case, including this one, Segal signed complaints containing the false statement

that "*the cause of action accrued here.*" Doc. 1-1, ¶ 2 (emphasis added). And, as discussed

below, in some of the few cases that were originally filed in the proper county, Segal

later re-filed those same complaints in a different improper county, thus necessitating

that he make *contrary* assertions of fact to two completely different courts. *Infra*, § III.D.

The obvious effect of Segal dispersing eighty lawsuits throughout nearly every

county in the state—and not filing them in the proper counties—was to ensure that the

different judges reviewing these cases would not perceive any patterns, and to make it

far more difficult for defendants to discover them. In other words, these cases were not

filed in the wrong county so that it would be more convenient for Segal to litigate, and

less convenient for the defendants—*which itself would be improper*—but instead, for the

far more egregious reason that scattering them throughout the state would make it much more likely that Segal would be able to improperly obtain default judgments.

It has been readily apparent throughout this litigation that the chosen counties are improper. *See, e.g.*, Charlotte County Case No. 20000747CA (sua sponte order denying motion for summary judgment because, among other reasons, "[t]he allegations of the Complaint fail to allege any facts that would make Charlotte County a proper venue for this case."); Hardee County Case No. 25-2020-CA-000310 (same); Putnam County Case No. 20-CA-276 (Order denying motion summary judgment after default, stating: "When [Segal] was asked why this suit was brought in Putnam County, his answer was that Plaintiff and his former counsel had an agreement to bring suit in Putnam County, which is not sufficient to establish venue in this county."); Case No. 8:21-cv-000752-MSS-CPT, Doc. 25 (N.D. Fla. Mar. 29, 2021) (quashing service, vacating default, and transferring case to Middle District because "the case arose out of a foreclosure in Hillsborough County and the parties and their dispute have no connection to [the Northern District]").

On this basis alone, sanctions against Segal are appropriate. In *Methode Electronics, Inc. v. Adam Technologies, Inc.*, 371 F.3d 923 (7th Cir. 2004), the court affirmed sanctions and attorney's fees under the district court's inherent power because the district court found "not only that [plaintiff's] venue allegations were false, but that [plaintiff's] conduct in advancing them was intentionally deceptive." *Id.* at 928. In that case, the court awarded monetary sanctions against the plaintiff's attorney who signed

QB\68197493.2

the complaint based on that *one* instance of making false allegations as to venue, for the purpose of trying to gain some tactical advantage in the litigation. *Id.*

Segal's conduct far exceeds the conduct in *Methode* or in any other known case. Segal filed identical lawsuits in nearly every county in Florida, without any connection to the venues chosen, based on false allegations, so that his complaints and default judgments would remain undetected. Clearly that is improper and sanctionable.

**D.** **Segal vexatiously and unreasonably multiplied the proceedings by voluntarily dismissing cases after defendants appeared before default was entered, and then re-filing the complaints in other venues, without any notice to defendants or their counsel of record.**

Perhaps the most egregious conduct committed by Segal—and the clearest indication that these cases are designed *solely* to obtain secret default judgments, at any cost—is what Segal did in the numerous cases where he was not able to obtain a quick default judgment. Remarkably, in these situations, Segal simply dismissed the case, and then surreptitiously re-filed it in a different county, without any notice to the defendant or its counsel of record. *See, e.g.*, Ex. 2, Rows 3, 5, 6, 10, 13, 14, 19, 34, 35, 52, 53, 58, 73, 74. In fact, well over a dozen of these cases were re-filed in different counties based on identical complaints, meaning that *thirty* of the total lawsuits filed against DBNTC and BNYM involve complaints that have been re-filed in different counties. Ex. 2, Rows 1-6, 9, 10, 12-14, 16, 17, 19, 24, 25, 28, 30, 34, 35, 43, 51-54, 58, 70, 73-75. Obviously the sole purpose in dismissing and re-filing these cases, without providing any notice to the defendant or its counsel of record, was to obtain an improper tactical advantage—*i.e.*, a default judgment based on the same claim.

For example, on August 13, 2020, Segal filed a complaint against DBNTC in Lee County based on a pending Hillsborough County foreclosure action. Ex. 2, Row 14. Defendant's undersigned counsel promptly appeared in that case and filed a motion to dismiss. While the parties were discussing the issue of venue pursuant to court order, Segal voluntarily dismissed the Lee County case. Sixteen days *before* dismissing the case, and while the parties were discussing that any re-filed case should be filed in Hillsborough County, Plaintiff re-filed the same complaint in St. Johns County, *without notifying undersigned counsel of the re-filed case, despite undersigned's counsel's explicit request to be notified of any re-filed case.* As intended, that led to a default against DBNTC in the re-filed case, which Segal is refusing to vacate. Ex. 2, Row 52.

Similarly, on August 11, 2020, Segal filed a complaint against DBNTC in Pasco County based on a pending Pasco County foreclosure action. Ex. 2, Row 10. After the Pasco County court denied summary judgment and consolidated the action with the pending foreclosure action, Segal voluntarily dismissed the complaint. Ex. 2, Row 10. *Twenty-four minutes* later, Segal re-filed the complaint in Columbia County. Ex. 2, Row 58. In the Pasco County case, Segal identified the plaintiff as "Inland Assets, LLC, as Trustee of the 4417 Rudder Way Land Trust." Ex. 2, Row 10. To make detection of the second case more difficult, Segal identified the plaintiff in the re-filed case as "4417 Rudder Way Land Trust, By: Inland Assets, LLC, Trustee." Ex. 2, Row 58.

Those cases are not isolated examples, but instead, are representative of Segal's improper tactics throughout. *See* Ex. 2, Rows 1-4, 6, 9, 12, 13, 16, 17, 19, 24, 25, 28, 30, 34, 35, 43, 51, 54, 70, 73-75. This Court and others have recognized the

13

improprieties of Segal's tactics, including obtaining defaults in new cases without providing any notice to defendant's counsel of record, contrary to Florida law, and improperly re-filing these cases in new counties. *See* Case No. 8:21-cv-469-WFJ-TGW (M.D. Fla. Apr. 13, 2021) ("[Plaintiffs] and their lawyer Mr. Segal were litigating for several years with the same bank over the same land, in the same courthouse, with a similar cause of action… They were not at liberty to steal a march or sneak in a clerk's default at the same time in a new, related case they informed no one about… Failure to alert fellow counsel before moving for a clerk's default in this related suit with the same parties requires the default to be vacated."); Case No. 2:21-cv-00047-SPC-NPM, Doc. 25 (M.D. Fla. Apr. 3, 2021); Pasco County Case No. 2020-CA-1437.

Sanctions are appropriate for this type of improper conduct, including attempting to re-litigate the same issues in multiple forums, and for seeking defaults against defendants without providing notice to defendant's counsel. For example, in *Hayden v. Vance*, 708 Fed. Appx. 976 (11th Cir. 2017)*,* the Eleventh Circuit affirmed sanctions where the plaintiff attempted to relitigate the same issues and to attack a state court judgment by filing multiple complaints, explaining "that Plaintiff simply will not accept the state court judgment and keeps court shopping in the vain hope to find someone who will agree with him." *Id*. at 978-79; *see also Arunachalam v. Int'l Bus. Machines Corp.*, 989 F.3d 988, 997 (Fed. Cir. 2021) ("Even after the dismissal of her RICO claims against [defendants] in the District Court, [plaintiff] reasserted those same claims against [defendants] in another action in the U.S. District Court for the Northern District of California, further evidencing her vexatious and bad faith

14

conduct."); *Carroll v. E One Inc*, 893 F.3d 139, 152 (3d Cir. 2018); *Fritz v. Honda Motor Co.*, 818 F.2d 924, 924–25 (D.C. Cir. 1987).

The situation here is far worse than in *Hayden* or any other known case imposing sanctions. First, Segal has re-filed these identical lawsuits against DBNTC and BNYM over a dozen times, and not just once or twice. Second, Segal is not even trying to find a court "who will agree with him" and render judgment on the merits, because he's shown that he has no desire to litigate these cases on the merits. Instead, he has resorted to litigating solely through unprofessional gamesmanship, including surreptitiously re-filing cases in new venues without providing any notice to the defendants or their counsel of record, for the sole purpose of trying to obtain default judgments. In other words, these are not genuine lawsuits, but rather, an abuse of the court system to commit a massive bank heist. It is hard to fathom how any conduct by an attorney could be more disturbing or more epitomize sanctionable conduct.

### E.   Segal's complaints and filings in these cases were frivolous, were filed in bad faith, and served to vexatiously multiply the proceedings.

Segal's identical complaints in these cases—and his entire theory for liability— merely recycles frivolous and nonsensical foreclosure "defenses" that Florida's state courts have rejected in countless cases. *See, e.g.*, *HSBC Bank USA, Nat'l Ass'n v. Buset*, 241 So. 3d 882, 889-891 (Fla. 3d DCA 2018); *Citibank, N.A. v. Olsak*, 208 So. 3d 227 (Fla. 3d DCA 2016). In short, Segal alleges that the defendants lacked standing to foreclose because "it was illegal for Defendant to own or hold the Notes," even though Florida law is clear that they were entitled to foreclose (as they proved in the

foreclosure cases) because they were in possession of the original promissory notes endorsed in blank. *Id.* On top of that, Segal attempts to turn his disagreement with well-settled Florida law on standing to foreclose into a RICO claim, despite failing to allege any of the necessary elements of a RICO claim. And, even assuming these complaints somehow stated a claim, they are still clearly barred by res judicata, collateral estoppel, and the litigation immunity privilege, and were compulsory counterclaims in the foreclosure cases.

Also, as a reflection of the frivolousness of these cases, many of them, including this case, involve signed settlement agreements between the parties, expressly releasing plaintiff's "claims." *See e.g.,* Ex. 2, Rows 36, 40, 56, 57. On January 28, 2019, Plaintiff and Defendant entered into a Settlement Agreement and Release of Claims, which broadly released all claims relating to the Foreclosure Action, the Property, or the mortgage, including the precise claims that form the basis for this new lawsuit. Doc. 15-7. The Settlement Agreement is between Plaintiff and Defendant, and it specifically identifies counsel for each party, including Segal who signed as the attorney for Plaintiff, along with disbarred attorney Mark Stopa who signed as the principal for Plaintiff, so there could be no denying that either Plaintiff or its counsel are aware of the Settlement Agreement. *Id.* Pursuant to the Settlement Agreement (¶ 3C), on March 14, 2019, the court entered an Agreed Order Vacating Final Judgment of Foreclosure, Dismissing Action, and Discharging Lis Pendens. Doc. 15-8. In addition, pursuant to the Settlement Agreement (¶ 3D), the Defendant recorded a Satisfaction of Mortgage. Doc. 15-9. As a result, the Foreclosure Judgment was vacated, the foreclosure sale

16

never occurred, and title never transferred as a result of the Foreclosure Action, and in fact, the mortgage itself has been satisfied and released. Thus, to be clear, not only has this particular Plaintiff released the exact claims that form the basis for this meritless suit, but in fact, the entire suit challenges an event—an allegedly improper foreclosure sale that allegedly deprived Plaintiff of title—that never even occurred. In fact, Plaintiff—who continued to own the Property, free and clear of the mortgage—later sold the Property to a third party in July 2019 for $260,000 (*i.e.*, fair market value), which further demonstrates the frivolousness of Plaintiff's "claims." Doc. 15-10.

Although these cases do not get litigated on the merits, some courts have nevertheless commented on them, including this Court and state court judges who refused to enter default judgments. *See, e.g.*, Charlotte County Case No. 20000747CA (denying motion for summary judgment after default, sua sponte, because, among other reasons, "[t]he allegations of the two counts fail to state a cause of action," and "[t]his case appears to be an improper collateral attack on two other actions"); *see also* M.D. Fla. Case No. 8:21-cv-00626-SPF, Doc. 21 (Apr. 30, 2021) (granting unopposed motion to dismiss on the merits because the Court has "carefully reviewed the allegations of Plaintiffs' Complaint and the arguments made in Defendant's Motion to Dismiss, and the Court finds that Defendant's arguments are meritorious"); Case No. 8:21-cv-000752-MSS-CPT, Doc. 25 (N.D. Fla. Mar. 29, 2021) ("The complaints in each case are fundamentally identical except for the quintessential variables of the plaintiff and property. But these facts are virtually irrelevant to the legal claims as currently pled. Indeed, the allegations as to the supposed fraudulent behavior in each

17

of the underlying foreclosure actions is generalized and not case specific."); Case No. 2:21-cv-00040-SPC-NPM, Doc. 26 (M.D. Fla. Mar. 1, 2021); Case No. 2:21-cv-00037-SPCNPM, Doc. 30 (M.D. Fla. Mar. 1, 2021); Case No. 2:21- cv-00042-SPC-NPM, Doc. 31 (M.D. Fla. Mar. 1, 2021); 2:21-cv-00039-SPC-NPM, Doc. 24 (M.D. Fla. Mar. 1, 2021); 2:21-cv-00038-SPC-NPM, Doc. 29 (M.D. Fla. Mar. 1, 2021); 2:21-cv-00009-SPC-NPM, Doc. 30 (M.D. Fla. Mar. 1, 2021).

Obviously these complaints were never intended to be litigated on the merits. In fact, as discussed above, Segal voluntarily dismissed these cases if the defendant appeared before default was entered. *Supra*, § III.D. Never once did Segal attempt to prosecute the merits of a case after defense counsel appeared. But the fact that these frivolous complaints were filed in the first place merits sanctions, because knowingly pursuing frivolous claims, on its own, warrants sanctions against Segal under the courts inherent authority. *See Peer v. Lewis*, 571 Fed. Appx. 840, 843 (11th Cir. 2014); *see also Arunachalam v. Int'l Bus. Machines Corp.*, 2021 WL 772260 (Fed. Cir. Mar. 1, 2021); *Eldredge v. EDCare Mgmt., Inc.*, 766 Fed. Appx. 901, 905 (11th Cir. 2019); *Terra Partners v. Rabo Agrifinance, Inc.*, 504 Fed. Appx. 288, 290 (5th Cir. 2012); *Maid of the Mist Corp. v. Alcatraz Media, LLC.*, 446 Fed. Appx. 162, 164-65 (11th Cir. 2011); *Torres v. City of Orlando*, 264 F. Supp. 2d 1046, 1053 (M.D. Fla. 2003); *McLaughlin v. Bradlee*, 602 F. Supp. 1412, 1417 (D.D.C. 1985), *aff'd,* 803 F.2d 1197 (D.C. Cir. 1986).

Here, Segal—who is an experienced foreclosure defense attorney, and therefore well aware that these foreclosure "defenses" are not supported by Florida law, and

obviously fail to establish a RICO claim—has knowingly filed identical frivolous complaints in each of these cases. That alone merits sanctions.

Separately, Segal's scheme was based on frivolous motions for summary judgment and improper "affidavits" in support. Because the "damages" alleged in the complaints are not liquidated, the defendants were still entitled to a trial on the amount of damages, after proper notice to the defendants, despite the defaults. *See* Fla. R. Civ. P. 1.440(c); *MacDonnell v. U.S. Bank N.A.*, 293 So.3d 585, 589 (Fla. 2d DCA 2020). Therefore, it was improper for Segal to obtain these default judgments through motions for summary judgment. Furthermore, these "affidavits"—which merely state that someone reviewed Realtor.com or Zillow.com—were still inadmissible and insufficient to establish any damages. *See, e.g.*, Charlotte County Case No. 20000747CA (sua sponte order denying motion for summary judgment because, among other reasons, "[t]he affidavit of damages is insufficient under Florida law," and "the damages in this case are unliquidated so any trial must be noticed as a jury trial"); *see* Fla. R. Civ. P. 1.510; *Fla. Dep't of Fin. Servs. v. Associated Indus. Ins.*, 868 So. 2d 600, 602 (Fla. 1st DCA 2004). Obviously, trying to prove at trial that these shell companies, who purchased these properties subject to senior lien foreclosure cases for pennies on the dollar, incurred actual damages in these frivolous cases likely would have been impossible. It also would have exposed Segal and his "client" to obvious risks and sanctions, including perjury. Presumably that is why the "affidavits" do not reference "damages" whatsoever, or even attempt to explain how the plaintiff was

injured. In reality, each of these motions and affidavits were improper and filed in bad faith for the sole purpose of obtaining default judgments for exorbitant amounts.

In addition, once the defendant discovered the lawsuit and appeared after a default was entered, Segal engaged in a ruthless campaign in the state courts of filing baseless motions that served to multiply the proceedings. In response to the defendant appearing in the case and moving to quash service and vacate the defaults (after Segal refused to agree to vacate the defaults), Segal immediately responded by filing baseless motions for disqualification and for sanctions in the state courts, simply because defendants were moving to vacate the default. *See also, e.g.*, Doc. 1-9 (Segal's motion to strike motion to quash and for sanctions), Doc. 33 (order denying same). And in the federal courts, he filed unsupported motions for remand and oppositions to defendants' motions to vacate defaults, including failing to even address the fact that these defaults all need to be vacated because defendants had a good faith basis for not responding to the summonses and complaints that they never received. *See* Docs. 3, 21; *see also* Doc. 35 (motion to stay adjudication of motion to quash pending discovery, even though no discovery was pending and motion to quash had been resolved).

Then, after refusing to agree to vacate the defaults, and forcing defendants to heavily litigate the validity of the defaults and the service issues, Segal would often fail to even respond to defendants' motions, including many of defendants' motions before this Court. For example, Segal made clear during meet and confers that he opposed Defendant's Motion to Dismiss, filed on April 8, 2021, but as expected, he failed to timely respond to the motion, further evidencing that Segal does not intend to litigate

20

these cases on the merits. *See also, e.g.,* Ex., 2, Rows 1, 13, 26, 40, 42, 53, 65, 66, 67, 68 (orders granting motions to vacate and dismiss due to Segal's failure to respond).

This type of conduct—which requires his adversaries and the courts to needlessly engage in extensive work to obtain the same results that defendants are seeking from the outset—is another clear example of vexatiously multiplying the proceedings, and it merits sanctions. *See, e.g.*, *Fritz v. Honda Motor Co.*, 818 F.2d 924, 924–25 (D.C. Cir. 1987) (affirming sanctions and attorney's fees against plaintiff's counsel under court's inherent authority and 28 U.S.C. § 1927 where district court found that plaintiff's counsel "repeatedly took actions which required [defendant] to expend unnecessary time and money, even though he had no intention of pursuing this litigation in federal court," and specifically, that he "refused to dismiss the complaint voluntarily after being informed by defendants' counsel that service of process … had been defective, thereby forcing [defendant] to file a motion to dismiss to which [plaintiff's counsel] made no opposition").

Segal's complaints, and most of his motions, filings and other litigation conduct, were frivolous, filed in bad faith, objectively unreasonable, and served to vexatiously and unreasonably multiply the proceedings. Accordingly, sanctions are proper.

### F.   Segal intentionally failed to serve defendants with court filings, contrary to his certificates of service, as doing so would have defeated his entire scam.

Segal's entire scheme depended on DBNTC and BNYM not receiving *any* notice of these cases whatsoever, including *any* of his court filings. But at the same time, Segal had to include certificates of service on his court filings in order to obtain

default judgments. The record in these cases, which includes dozens of signed affidavits from DBNTC and BNYM, confirms that they received *none* of Segal's filings. But it also confirms that they routinely received and responded to the court filings that were mailed by the courts. Obviously there is only one explanation.

For example, in one of the cases against DBNTC handled by undersigned counsel, DBNTC *only* learned of the action because *the state court—not Segal*—mailed DBNTC a notice of an upcoming hearing on Segal's motion for summary judgment. N.D. Fla. Case No. 1:21-cv-00028-AW-GRJ, Doc. 6-2. As detailed in DBNTC's affidavit in that case (*id.*), the court's notice of hearing was mailed to DBNTC at 60 Wall Street, New York, NY, so it took about ten days before DBNTC actually received it on March 1, 2021—after it was received in New York and then routed by mail from New York to California where DBNTC's main office is located. *Id.* That is the very first time DBNTC learned of that particular case. *Id.* After learning about the case, DBNTC diligently searched its records for "any court filings by plaintiff George Widunas in the State Court Action, including the summons, complaint, or any of plaintiff's motions or notices filed in the State Court Action prior to March 1, 2021, including relating to, leading to and concerning entry of the default against DBNTC, but no such records were located (except for the court's Notice of Hearing at Exhibit 1 received on March 1, 2021)." *Id.* In response to receiving this one notice, DBNTC immediately retained counsel to defend the case. *Id.*, Doc. 6.

Likewise, in one of the cases against BNYM handled by undersigned counsel, BNYM *only* learned of the action because *the state court—not Segal*—mailed BNYM a

final default judgment. *See* M.D. Fla. Case No. 8:21-cv-00626-SPF, Doc. 22-4 (BNYM's affidavit, filed in Taylor County Case No. 20-CA-380). BNYM's affidavit explains that BNYM first learned of the case on December 9, 2020, when it received a copy of the judgment—in an envelope mailed by the court from Tallahassee, but addressed by Segal—that was improperly addressed to "240**0** Greenwich St., New York City, NY 10286." *Id.* The envelope and enclosure were scanned and logged by BNYM that same day, and the matter was promptly referred to legal counsel.

Ultimately, the affidavits in these cases show that (1) DBNTC and BNYM receive mail that is actually sent to them (even at the 60 Wall Street address for DBNTC, a building housing multiple distinct Deutsche Bank entities that has been closed since March 2020 due to the COVID-19 pandemic, and even if slightly misaddressed for BNYM), (2) they each diligently act upon legal documents that they receive (even a form notice of hearing that does not provide any substantive information, and a default judgment that does not contemplate further proceedings), and (3) they never received any of Segal's court filings in these cases.[5]

Those facts—documented in dozens of affidavits—are clear from the record and speak for themselves. And frankly, given his other improprieties and efforts to evade detection, it would have been surprising if Segal had mailed his court filings to the defendants. Doing so would have prevented him from achieving his sole objective—

---

[5] Interestingly, it appears that Segal's mail may be handled by disbarred attorney Mark Stopa. *See, e.g.*, M.D. Fla. Case No. 2:21-cv-00080-SPC-NPM, Doc. 24 (Stopa's affidavit attesting that Stopa "personally mailed" the response letter to CT Corp that was signed by Segal, with attorney Lazenby's letterhead, even though Segal had never formally appeared).

obtaining default judgments. But failing to mail court filings to parties, contrary to signed certificates of service, is sanctionable. *See, e.g.*, *Jade Winds Ass'n, Inc. v. Citibank, N.A.*, 63 So. 3d 819, 822 (Fla. 3d DCA 2011); R. Regulating Fla. Bar 4-3.5.

Accordingly, based on the totality of Segal's actions in these cases, as well as his individual improper tactics, sanctions and attorney's fees should be awarded.

## IV.   MONETARY AND NON-MONETARY SANCTIONS REQUESTED

WHEREFORE, Defendant respectfully requests the following relief:

1.     An award of Defendant's reasonable attorney's fees and costs incurred in defending this action, jointly and severally against attorney Lee Segal a/k/a Lior Segal and his firm, Segal & Schuh Law Group, P.L. Pursuant to Local Rule 7.01(b)(2), Defendant estimates its attorney's fees and costs to be approximately $45,000.00.

2.     An order requiring Lee Segal a/k/a Lior Segal to disclose all known lawsuits filed against DBNTC and BNYM that are not listed on Exhibit 2. These cases have been extremely difficult to locate, requiring hundreds of hours of research, and continue to be discovered. On March 9, 2021, after numerous requests, Segal personally confirmed to undersigned counsel that the Widunas case discussed above, and discovered on March 1, 2021 (Ex. 2, Row 31), was the final case involving Segal against DBNTC and BNYM in which the defendant had not appeared. But within the past few weeks, DBNTC discovered yet another one of these cases, filed in Suwannee County, which is one of multiple counties where court filings are not electronically-accessible (Ex. 2, Row 64). In that case, Segal obtained a default final judgment against DBNTC on January 27, 2021 in the amount of $805,708.50. Undersigned counsel

recently appeared in that case, which Segal failed to disclose. Ordering this non-monetary relief is important, and imposes a minimal burden on Segal.

3.    Any additional and further relief that this Court deems just and proper.

## LOCAL RULE 3.01(g) CERTIFICATION

Undersigned counsel certifies that Defendant has conferred with Plaintiff's counsel, Lee Segal, including by telephone on April 21 and May 4, 2021 in a good faith effort to resolve the issues raised in this motion and have been unable to do so.

QUARLES & BRADY LLP

By: */s/ Joseph T. Kohn*
    Joseph T. Kohn
    Florida Bar No. 113869
    Benjamin B. Brown
    Florida Bar No. 13290
    1395 Panther Lane, Suite 300
    Naples, FL 34109
    239/659-5026 Telephone
    joseph.kohn@quarles.com
    benjamin.brown@quarles.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed on May 4, 2021, using the CM/ECF e-filing system, and a true and correct copy was served on Plaintiffs' counsel, Lee Segal, Esq., Segal & Schuh Law Group, P.L., 18167 U.S. Hwy 19 N. Suite 100, Clearwater, FL 33764, lee@segalschuh.com.

/s/ *Joseph T. Kohn*
Joseph T. Kohn

QB\68197493.2